# CHARLESTON.

## STATE v. McALLISTER.

Submitted May 2, 1908.   Decided February 2, 1909.

1. ROBBERY—*Definition.*

    Robbery, at common law, as defined by text writers, is the felonious and forcible taking from the person of another of goods or money to any value, by violence or putting in fear.   (p. 101.)

2. CRIMINAL LAW—*Venue.*

    Under the constitution and laws of this state a crime can be prosecuted and punished only in the state and county where the alleged offense was committed.   (p. 102.)

3. SAME—*Venue—Place of Commission of Crime.*

    The defendant, indicted jointly with others, was tried and convicted of robbing one Wallace of two checks, one drawn by Wallace to which he signed the name of his wife, payable to one York; the other by said York payable to one Curry, the latter being delivered by York to Wallace in exchange for the former, these transactions taking place at York's store in Wayne county, in the presence of defendant and those indicted with him, who, armed with dangerous weapons, had arrested Wallace in Kentucky and taken him there to procure the money or check; but the check was not actually delivered until after Wallace had been taken back to Kentucky by his captors, where, as directed by them, Wallace delivered it to a third person to be delivered to Curry, in whose favor it was drawn.   *Held:* That if defendant is guilty of robbery, the crime was committed in Kentucky, where the check of York was reduced to actual possession.   (p. 103.)

4. ROBBERY—*"Taking"—What Constitutes.*

    By the taking, necessary in the offense of robbery, is implied that the robber must be in the possession of the thing taken; and the offense is not actually completed without such taking, and the thing taken must be of some value, and taken from the peaceable possession of the owner, the gist of the action being the force and terror employed in obtaining it.   (p. 104.)

5. TAKING BY DURESS.

    *Quaere:* Does the act of obtaining a check from a person, under duress, as proven in this case, constitute the crime of robbery?   The question discussed and authorities cited, but not decided.   (p. 104.)

Error to Circuit Court, Wayne County.

William McAllister₀ was indicted, with certain other defendants, for robbery, and on conviction brings error.

*Reversed.*

W. E. CHILTON, W. W. MARCUM, and NAPIER & MEEK, for plaintiff in error.

WM. G. CONLEY, Attorney General, for the State.

MILLER, PRESIDENT:

The defendant was indicted jointly with Morgan Curry, Bob Dillon and Harrison Dillon. The first count charged that, being armed with dangerous and deadly weapons, they feloniously assaulted John B. Wallace, and did feloniously and violently steal from him, and take and carry away a certain check drawn by Sarah A. Wallace, to the order of John Y. York, on the First National Bank of Louisa, Kentucky, for the sum of two hundred dollars, and of the value of two hundred dollars, of the goods and chattels, property and check of the said John B. Wallace; the second count charged the same persons with stealing in the same manner from said John B. Wallace a certain other check made by John Y. York, to the order of Thomas Curry, for the like sum and value of two hundred dollars, payable at the Big Sandy National Bank, of Catlettsburg, Kentucky; the third count charged them with stealing from said Wallace in like manner, two hundred dollars in gold and silver certificates and greenbacks, and in gold and silver coin, of the value of two hundred dollars.

Upon the trial of the issue joined, upon the plea of not guilty, the jury found McAllister guilty of the felony, as charged in said indictment; upon which verdict judgment of imprisonment was pronounced against him, that he be imprisoned in the penitentiary at Moundsville for the term of ten years.

All points of error relied on here are involved in the answer to two questions: First, is the prisoner guilty of the offense of which he was convicted? and, second, if he is, was the crime committed within Wayne County, West Virginia? There was no attempt to prove the robbery or theft, charged in the third count, and no conviction could be sustained thereon. The facts upon which the state relied to sustain conviction upon the first and second counts were susbstantially these: John B.

Wallace, charged to have been robbed, about January 1, 1905, was residing with his wife near Louisa, Kentucky, near the Wayne county, West Virginia line, where he was keeping what is called in the record a "blind tiger," a place for the illicit sale of intoxicating liquors. Morgan Curry, Bill Little and Tom Curry, armed with rifles called and demanded of Wallace whisky on credit. Wallace at first refused them the whisky, but finally gave them one bottle; they then went away, but returned shortly, and demanded more whisky; he then gave them three bottles, and on a third visit he gave them another bottle; they again departed but returned demanding more liquor. Wallace and wife by this time had locked themselves up in their home and refused to give out any more liquor. Numerous shots were then exchanged between Wallace or Wallace's wife and their assailants, one of the balls discharged by Mrs. Wallace, it is said, hitting Tom Curry, a brother of Morgan Curry, in the leg. Mrs. Wallace was also hit in the leg by a ball from one of the guns of her assailants. Night coming on Wallace and wife made their escape across the river to Louisa, and some time during the night Wallace having procured a warrant, arrested Lewis Dillon, and had him locked up in jail at Louisa. Early the next morning Morgan Curry, Bob Dillon, the defendant McAllister, son-in-law of Lewis Dillon, and others, most of them armed with winchesters and shot guns, were found at a hotel in Louisa, whither they had gone some time during the night, and seeing Wallace on the street near the hotel, Morgan Curry rushed out with his rifle, followed by McAllister and their confederates, called upon Wallace to hold up his hands, and informed him that he was under arrest. Handcuffs were also put upon him, and he was informed by one of the crowd that they were going to hang him, and they started with him in the direction of the Falls of Tug River. After they had gone some distance, Wallace persuaded them to take the handcuffs off, and they proceeded with him to the home of Lewis Dillon, where dinner was procured. On the way to Lewis Dillon's Wallace says they planned his execution; that during the journey or perhaps after they reached Dillon's residence, he, Wallace proposed to buy his liberty, and was asked by one of his captors how much money he had; that he answered he had four hundred dollars, and proposed to give them two hundred dollars if they would turn

him loose, which they did not agree to do at first, but afterwards they inquired of him if he could get the money; he answered he thought he could get it from John Frazier, near by; but finding, that Frazier was not at home, he suggested that he might get it from John Y. York, in Wayne county, and they then led him across the river into Wayne county, West Virginia, to the store of said York. When they reached York's store, Wallace explained to him his situation, told York his life was threatened by his armed captors, and that unless he could raise two hundred dollars for them, they threatened to hang or shoot him. Under these circumstances York was persuaded to make his check payable to Thomas Curry described in the second count of the indictment, giving it to Wallace in exchange for the check of Sarah A. Wallace, described in the first count of the indictment. Having thus obtained this check of York, Wallace was led back by Curry and his other captors across the Sandy river into Kentucky, to the home of one Stanley Chafin, a Notary Public, where according to Wallace's evidence, corroborated by the evidence of other witnesses, including the Notary himself, he was required to take an oath not to prosecute these desperadoes for anything that had occurred, and at which time and place Wallace delivered over, either, as he testified, to Morgan Curry, or, as the other evidence tends to show, to Jim Stilton, the check obtained from York, payable to Thomas Curry. While Wallace, in his testimony, intimates that he may have given York's check to Morgan Curry, at the former's store, or on the way back before crossing the river into Kentucky, he is not sure that he did so. One of the defendant's witnesses testified that while still in Wayne county, West Virginia, Wallace offered the check to Curry, but that Curry refused to receive it. At one place in Wallace's testimony, he says: "To the best of my recollection, as well as I remember, I give it to Morgan Curry in Kentucky. That is my best recollection." At another place, on re-direct examination, in reply to the question, "I believe you stated that your best recollection was that you delivered this check up to Morgan Curry before you crossed the river into Kentucky?" he answered: "Yes sir; that is my best recollection about it." But he had not stated in his previous testimony that it was his best recollection that he had thus delivered this check to Morgan Curry. He had said on examination in

chief, that he had delivered his wife's check for two hundred dollars to York at York's store; but on further cross examination he distinctly admits that he is not positive where it was he gave the check to Curry, whether in West Virginia or in Kentucky. On the other hand the evidence of Stanley Chafin, a Notary Public, McAllister, and the testimony of other witnesses shows, conclusively, that York's check was not turned over to Curry at all, though first offered to Curry by Wallace, but was delivered to Jim Stilton at Chafin's house in Kentucky, after they had arrived there, and Wallace had made his affidavit. This affirmative evidence on the question of the delivery of the York check is so preponderating over the uncertain testimony of Wallace that we must say the jury was not justified in finding as a fact that Wallace delivered the check of York in West Virginia. The evidence of defendant and his witnesses tends to show that he was forced by Curry to accompany him to West Virginia, that he did not go willingly, and that it was Wallace's own proposition to pay two hundred dollars to Thomas Curry, to aid him in his endeavor to be cured of his wound, inflicted by Wallace's wife.

Did this evidence justify the verdict of the jury and judgment of the circuit court thereon? We are obliged to say that in our opinion the verdict and judgment cannot be sustained. The charge against the defendant is robbery, and he was convicted of robbery. Section 4211, Code 1906, provides that "If any person commit robbery, being armed with a dangerous weapon, he shall be confined in the penitentiary not less than ten years; if not so armed, he shall be confined therein not less than five years." What is robbery? Our statute does not define it. The offense referred to in the statute is the common law offense of robbery. As defined by Bishop, 2 Bishop Criminal Law, section 1156, "Robbery is larceny committed by violence from the person of one put in fear." Other definitions are given by him in a foot note, that of Blackstone being, "The felonious and forcible taking, from the person of another of goods or money to any value, by violence or putting him in fear." Our constitution, section 14, article 3, provides that trials of crimes shall be in the county where the alleged offense was committed. *Ex Parte McNeeley,* 36 W. Va., 84. Section 12, chapter 152, Code 1899, in so far as it authorizes a crime to be prosecuted and punished

in a county, in which the offense was not committed, when the crime was committed within one hundred yards of the boundary line of the county, has been declared unconstitutional and void. *State* v. *Lowe,* 21 W. Va. 782. So that in order to sustain the verdict and judgment of the court below we must be able to say, as a matter of law, that the crime of which the defendant stands convicted, if guilty, was committed by him within Wayne county. It must be conceded that neither the defendant nor his confederates obtained either the check of Wallace or the proceeds thereof, in West Virginia; and the fact, practically uncontradicted, is that they did not secure the actual possession of the York check until after they had reached Kentucky, at the home of Chafin, the Notary Public. It cannot therefore be said, within the definition of robbery, that either McAllister or those indicted with him feloniously and forcibly took from the person of Wallace, within Wayne county, as charged, either of the checks described in the indictment, unless we can say, as a matter of law, that having forced Wallace, while under duress, to obtain the check of York, payable to Thomas Curry, Wallace thereby became a mere depositary for them, subject to their absolute control, whereby the crime became consummated within that county.

But what authority have we for any such holding? 1 Bishop New Crim. Law, section 748, says: "A person who by violence compels another to write an order for money or goods, intending to take it away, but is intercepted, does not commit an assault with intent to rob; because, if he had got off with the order, the transaction would not in law be robbery." The authorities cited by Bishop for this proposition are the two cases of *Rex* v. *Edwards,* 6 Carr. & P. 515 and 521. The indictment in the English cases referred to were under stat. 7 & 8 Geo. 4, c. 29, s. 6 which provides, "that if any person shall assault any other person with intent to rob him, or shall with menaces or by force demand any such property (i. e. any chattel, money, or valuable security) of any other person with intent to steal the same, every such offender shall be guilty of a felony," etc. We have no such statute making an attempt to commit the crime of robbery a felony. Section 4461, Code 1906, makes an attempt to commit an offense, unless such offense be punishable by death, a misdemeanor only. But the principle of the English cases is

applicable here, for it was held, that if the person demanding the money knowing that the money was not then in the possession of the party, and he only intended to obtain an order for the payment of it, he committed no crime under the English statute by procuring such order. Patterson, Judge, in the first of said cases, says: "If a man with menaces demands a sum of money of another, and the person does not give it to him because he had it not with him, the offense is the same; but if it turns out, as in this case, that a sum of money known to be not then in his possession was demanded, the case is different. The prisoners did not take anything from Mr. Gee: they got an order for the delivery of the deeds, and that was all they wanted." The same Judge says in the second case: "A robbery cannot be committed unless the person has the property in his peaceable possession, to do with it as he chooses. If Mr. Gee had brought the documents ready written, the case would have been different; but he does not write them until he is chained." In these cases Gee was decoyed into an out of the way place and chained down to a seat, and compelled to write an order for the payment of money, and an order for the delivery of deeds, the paper upon which he wrote them remaining in his hands half an hour; but he was chained all the time, and it was held that this was not an assault with intent to rob. The decision in these cases was based on Mrs. Phipoe's case, 2 Leach 673, cited with approval in *Rex* v. *Hart,* 6 Carr. & P. 106. In that case a promissory note was procured from one Courtoy by duress, while defendant held a carving knife over him, not only menacing him but having cut one of his fingers to the bone. The court held this was no felony, the note, so obtained, being so far from any value to Courtoy that he had not even the property of the paper on which it was written. It appearing that both the ink and paper on which the note was written were the property of Mrs. Phipoe. In *Jackson* v. *State,* 69 Ala. 249, 252, the court commenting on the case then in hand says, by way of illustration: "Hence, if by putting in fear, or by actual violence to the person, a promissory note is extorted, this is not robbery, for the note is void; it is of no value to the wrong-doer, and of no detriment to him from whom it is forced. But taking by violence from the person of the prosecutor a slip of paper containing a memorandum of a sum of money, which was due or

owing to him from another, is robbery. The paper was not
evidence of the debt which could have been used against the
debtor, but it was evidence that reminded the prosecutor of the
existence and amount of the debt; and, as was said by the court,
his keeping of it showed that he considered it of some value."
2 Russ. on Crimes, (9th Ed.) 99-100. This writer in a note,
referring to the provisions of the English statute, 24 & 25 Vict.
c. 96, section 48, says: "This clause is new. It will meet all
such cases as *Rex* v. *Phipoe,* 2 Leach 673, and *Rex* v. *Edwards,*
6 C. & P. 521 (25 E. C. L. R.), where persons by violence to
the person or by threats of accusation of crimes, induce others
to execute deeds, bills of exchange or other securities."

What will amount to the taking of property, necessary to con-
stitute the offense of robbery, is fully discussed by Mr. Russell,
with reference to the cases we have referred to, and many other
cases, and the rule announced by him is that: "By the 'taking'
necessary in this offense, is implied that the robber must be in
the possession of the thing taken; that the offense is not actually
completed without such taking;" that it must be taken from the
peaceable possession of the owner; that the property must have
some value, although the value is quite immaterial, the gist of
the offense being the force and terror employed in obtaining it.
He does say, however, that a taking in law will suffice, and need
not be immediately from the person of the owner; that it will
be sufficient if it be done in his presence, and he illustrates by
saying that, "If A., upon being assaulted by a thief, throws his
purse or cloak into a bush, and the thief takes it up and carries
it away; or if, while A. is flying from the thief, he lets fall
his hat, and the thief takes it up and carries it away, such
taking being done in the presence of A. will be sufficient." Many
other illustrations are given; but all go to show that to constitute
the crime of robbery, the robber must come into actual posses-
sion of the property, a thing of some value, against the will of
the owner and in his presence. 2 Russ. on Crimes, 100, etc.

These authorities convince us that the robbery with which
defendant is charged and convicted, by the judgment below, was
not consummated within the jurisdiction of West Virginia. The
exact question we have here, as to the place of venue of the
offense, was recently decided by the Supreme Court of Georgia,
where the facts involved were quite similar to those involved in

this case. In that case the person robbed, being found in one county, was handcuffed and led by his captors into another county, before they finally obtained from him the money of which they robbed him, and it was held, that the offense of robbery by intimidation was committed, and that the venue of the offense was the county in which the captors finally reduced the money to their exclusive possession, and not the county in which they seized the coat where the money was. This decision is in consonance with the other authorities cited, and we think there can be no question that whatever other offense the defendant, and his confederates, may have committed in the state of West Virginia, and in the county of Wayne, and whether or not the final obtaining of the check of York in Kentucky constituted robbery, no robbery was committed by them within the jurisdiction of Wayne county, and that the verdict and judgment against defendant must be set aside and a new trial awarded..

*Reversed.*