501 P.2d 1084

**The STATE of Utah, Plaintiff
and Respondent,**

v.

**Danny WETTSTEIN, Defendant
and Appellant.**

No. 12827.

Supreme Court of Utah.

Sept. 29, 1972.

Jimi Mitsunaga, Salt Lake City, for defendant-appellant.

Vernon B. Romney, Atty. Gen., David S. Young, David R. Irvine, Asst. Attys. Gen., Salt Lake City, for plaintiff-respondent.

CALLISTER, Chief Justice:

Defendant was tried by the court and convicted of the crime of robbery. He was sentenced to the Utah State Prison for an indeterminate term as provided by law. On appeal defendant urges that the trial court committed prejudicial error in its rulings as to the admissibility of certain evidence.

Shortly after 10 p. m. the attendant of a service station in Cache County, Utah, was robbed at gun point by a masked person. The attendant, whose head was covered and whose arms and legs were bound, shortly thereafter heard the whining sound of spinning wheels of motor vehicles near the station. Someone returned and inquired about the operability of the vehicles in the station. After the attendant freed himself, he observed two vehicles which had previously been located at the station; his automobile was stuck in a ditch to the east of the station, and a truck was parked on a nearby gravel road.

Prior to trial, a hearing was held on defendant's motion to suppress the testimony of two witnesses, Charles and Aneta Ames. Defendant asserted that the in-court identification by these witnesses was the result of two impermissible procedures, first, an illegal lineup conducted by the Logan City police in violation of defendant's right to counsel; second, the initial identification by means of selection of defendant's photograph from a group was unfair and unduly suggestive.

Mrs. Ames testified that on March 26, 1971, she, her husband and young children were driving toward their home about ten o'clock at night when they observed two cars, apparently stuck in a ditch. They stopped to offer assistance; they observed three people. A short, dark-complexioned man approached their car and put his head into the open window of the door. Mrs. Ames observed him closely and heard his conversation, wherein he requested Mr. Ames' assistance in lifting the car out of

the ditch. Mrs. Ames observed two vehicles, one behind the other, stuck in the mud. One was a Chevrolet, the other was a light blue Lark Studebaker, the right taillight was gone and the left one was illuminated but the lens was missing. Mrs. Ames was familiar with the Lark because her uncle owned a similar one; she also observed a Utah State University sticker in the back window of the Lark. Mrs. Ames testified that her observations of defendant's face were illuminated by the lights of the dashboard while his head was in the car, and the strong light cast by a mercury vapor lamp on a pole near the service station. Mr. Ames assisted in an unsuccessful attempt to extricate the vehicles; he then returned to his vehicle with an expressed intention to go home and bring his truck to the scene. Upon his return the people and the Lark were gone; the Ameses returned home and contacted the authorities.

On the same night, the Ameses selected defendant's photograph from a group of seven or eight; Mrs. Ames also identified the picture of another suspect, who was also convicted, in a separate trial. The Ameses again identified defendant's picture from a group on Sunday and the following Monday at the police station (the crime was committed the previous Friday night). Defendant was arrested Sunday, and the Ameses observed defendant and the other suspect through a two-way mirror on Monday morning at the police station and reiterated their identification of defendant. At defendant's trial counsel stipulated that the testimony of the Ameses would be the same as at the hearing of the motion to suppress.

At the hearing the trial court ruled that under United States v. Wade [1] and Gilbert v. California [2] the lineup was illegal since defense counsel was not present. However, the trial court found that the State had sustained its burden of establishing by clear and convincing evidence that the in-court identification of the witnesses was based upon observations of the suspect other than the lineup identification. The trial court duly commented on the testimony of the witnesses as to what they observed and physical factors under which these observations were made and thus determined that there was an independent origin of the identification other than the suspect lineup. The trial court, accordingly, denied the motion to suppress the testimony of the witnesses.

On appeal defendant contends that the lineup did, in fact, "taint" the subsequent in-court identification. There was substantial, competent evidence to support the determination of the trial court that the identification testimony had an independent

1. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967).

2. 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed. 2d 1178 (1967).

source.[3] However, there is another aspect which merits discussion, namely the allegation that the lineup procedure was unlawful because of the lack of presence of counsel, a violation of the Sixth Amendment.

The station house showup occurred the morning following defendant's arrest. This event preceded by some time the preliminary hearing or the filing of the information. In the recent case of Kirby v. Illinois,[4] the court considered whether to extend the Wade-Gilbert per se exclusionary rule concerning identification testimony based on a police showup prior to the suspect's being indicted or otherwise formally charged with a criminal offense. The court distinguished the privilege against self-incrimination which they observed was in no way involved in a lineup situation. The court stated that the Wade-Gilbert rule stems from the guarantee of the right to counsel contained in the Sixth and Fourteenth Amendments. The court continued that in all the cases where this right alone was involved, the point of time at which it was recognized, was at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. The court stated that the initiation of judicial criminal proceedings is far from a mere formalism, for it is the point that marks the commencement of the criminal prosecution to which alone the explicit guarantee of the Sixth Amendment is applicable. The court declined to apply this guarantee to a routine police investigation, which it asserted was applicable only after the onset of formal prosecutorial proceedings. Finally, the court observed that upon those occasions where the police abuse identification procedures during the course of a criminal investigation, the Due Process Clause of the Fifth and Fourteenth Amendments forbids a lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification.

Defendant further contends that the identification testimony of the Ameses should have been suppressed on the ground that it followed a pretrial identification by photographs, the presentation of which was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.[5] Defendant has emphasized the fact that of the photographs presented to the witnesses, his picture alone showed a person with a mustache, which made the identification of him inevitable.

At the hearing, Mr. Ames testified that in his original description to the police, he did not mention a mustache. Mrs. Ames

3. State v. Vasquez, 22 Utah 2d 277, 279, 451 P.2d 786 (1969).

4. 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed. 2d 411 (1972).

5. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

thought that she included the mustache in her description, but she was not sure. The investigating officer's notes merely indicate a short, dark-complexioned, young man. Mrs. Ames further testified that when she observed the photographs she was looking for someone of the general description of what she had observed, and was not necessarily looking for someone with a mustache. The exclusion of pictures of other persons with mustaches appears inadvertent, particularly, when the record does not indicate that the police knew that the witnesses had observed a person with such a feature.

In Stovall v. Denno [6] the court stated that a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it. The question to be resolved is whether the suggestive elements in the identification procedure made it all but inevitable that the witness would identify defendant, whether or not he was, in fact, "the man." [7] In Simmons v. United States, [8] the court suggested certain questions be considered in an evaluation of the totality of the circumstances in an identification procedure. First, was there justification for the procedure; was there a necessity for using the type of identification employed; were

the circumstances of an urgent character? Second, under the circumstances, was there a chance that the procedure utilized would lead to misidentification? The court mentioned factors, such as the opportunity and length of time that the witness had to observe the accused, and the period of time that had elapsed from the time of the incident to the identification, i. e., was the memory still fresh?

In the instant action, the photographic identification occurred within hours of the observation of the incident by the witnesses. From all the circumstances, the only suggestive element claimed was that defendant alone had a mustache in the group of pictures displayed to the witnesses. The trial court properly found that the identification was not induced by the conduct of the photographic display.

Defendant further contends that the trial court erred by denying a motion to suppress certain photographs of defendant's car on the ground that they were obtained by an illegal entry in violation of defendant's right to be secure from unreasonable searches and seizures.

The record reveals that a police officer interviewed Ann Fonnesbeck at her place of employment and inquired as to the whereabouts of defendant's Lark Studebaker. She informed the officer that the

---

6. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967).

7. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

8. Note 5, supra.

vehicle was parked behind the building, where she and her husband occupied an apartment. The police officer went to the neighborhood of the apartment and drove down an alley which runs through the block. From this vantage point, he observed the side of the suspect vehicle located in an uncovered parking space behind the multi-unit dwelling. The officer returned to the police station and procured a camera; he and a fellow officer drove to the Fonnesbeck dwelling, walked down the alleyway of the apartment building and photographed the vehicle. The Ameses subsequently identified the pictures as the same vehicle they had observed in the ditch.

The trial court denied the motion to suppress on the ground that defendant had no standing to claim a violation of his Fourth Amendment rights; he merely had permission from the tenants, Fonnesbecks, to park his car in the tenant's space; he did not reside there temporarily or otherwise. The trial court further found that taking a photograph was not a search and that defendant had no reasonable expectation of privacy when he parked his car in open view in someone else's driveway.

In People v. Terry [9] the defendant urged that the entry of the police into an apartment garage was an illegal trespass, and,

consequently, the search and seizure of evidence in plain sight located in an automobile parked therein was illegal.

The court responded that even if the officers' entry into the garage were a technical trespass, their observations therein did not constitute an unreasonable search; for the prohibition of the Fourth Amendment is against unreasonable searches and seizures not trespasses. The court observed that the garage, used in common by the tenants of the apartment building, was similar in nature to a common hallway of an apartment building where the police, in the performance of their duties, may, without violating the constitution, peaceably enter without a warrant or express permission to do so. The court concluded that the defendant's vehicle was parked in the garage with the evidence located in plain sight in the vehicle; any expectation by defendant of privacy as to objects in plain sight in the automobile would have been unreasonable; therefore, no constitutionally protected right of privacy was violated when the officers looked through the window of the vehicle.[10]

In State v. Montayne [11] this court stated that a person has standing to have relevant evidence suppressed or excluded only if the same were obtained by a violation of

9. 70 Cal.2d 410, 77 Cal.Rptr. 460, 454 P.2d 36, 47–48 (1969).

10. Also see People v. Ortega, Colo., 485 P.2d 894, 896 (1971); State v. Brown,

1 Or.App. 322, 461 P.2d 836 (1969); People v. Bradley, 1 Cal.3d 80, 81 Cal. Rptr. 457, 460 P.2d 129, 131 (1969).

11. 18 Utah 2d 38, 41, 414 P.2d 958 (1966).

the Fourth Amendment, which was designed to protect a person's right to privacy and property.[12] In the instant action, the record will not support a conclusion that defendant exhibited a reasonable expectation of privacy, which was violated by an unreasonable governmental intrusion, when the police merely walked upon the premises in which defendant claimed no interest and recorded by means of a camera the object they observed in plain sight.

The judgment of the trial court is affirmed.

TUCKETT and HENRIOD, ELLETT and CROCKETT, JJ., concur.

12. Also see State v. Meyers, 21 Utah 2d 110, 113, 441 P.2d 510 (1968).