STATE OF WEST VIRGINIA

*v.*

GARLAND WADE HARLESS

(No. 15006)

Decided December 18, 1981.

*Robert E. Vital* for appellant

*Chauncey H. Browning,* Attorney General, *Richard S. Glaser, Jr., Janet Frye Steele,* Assistant Attorneys General, for appellee.

MILLER, JUSTICE:

The defendant, Garland Wade Harless, was convicted by a jury of armed robbery and was sentenced to ten years in the State penitentiary by the Circuit Court of Cabell County. His primary error is the claim that the trial court incorrectly instructed the jury relative to the elements of the crime of robbery.

On January 3, 1979, at 6:30 p.m., Gloria Roberts was closing her beauty shop when her purse was grabbed and she was knocked backwards onto an iron post. No weapon was used in taking the purse, which contained $600.00 in cash and two diamond rings. On January 4, 1979, defendant was arrested attempting to pawn the rings owned by Mrs. Roberts and was charged with possession of stolen property. On January 7, 1979, Harless was indicted by the Grand Jury of Cabell County for armed robbery.

## I.

Defendant argues that the trial court erred in giving the following instruction on the two degrees of robbery set forth in *W.Va. Code,* 61-2-12:[1]

---

[1] *W.Va. Code,* 61-2-12, sets forth the distinction in the two degrees of robbery as follows:

"If any person commit, or attempt to commit, robbery by partial strangulation or suffocation, or by striking or beating, or by other violence to the person, or by the threat or presenting of firearms, or other deadly weapon or instrumentality whatsoever, he shall

## INSTRUCTION NO. 8
"(As Amended)

"The Court instructs the jury that under the indictment in this case, you may find one of three verdicts if the evidence so warrants: (1) Guilty of armed robbery; (2) Guilty of unarmed robbery; and (3) Not guilty.

"Armed robbery is when a person feloniously and forcibly takes from the person of another the goods or money of any value of such person by violence or by putting the person in fear.

"Unarmed robbery is when there is a felonious taking of another's property from her person and against her will but without violence or bodily force."

At common law, the definition of robbery was (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods. *State v. Fulks,* 114 W. Va. 785, 173 S.E. 888 (1934); *State v. Worthington,* 109 W. Va. 449, 155 S.E. 313 (1930); *State v. McAllister,* 65 W. Va. 97, 63 S.E. 758 (1909); LaFave & Scott, *Handbook on Criminal Law* 697 (1972); 67 Am.Jur.2d *Robbery* § 1 (1973). Thus, at common law, robbery could be accomplished either by actual physical force or violence inflicted on the victim or by intimidating the victim by placing him in fear of bodily injury. *State v. Alvis,* 116 W. Va. 326, 180 S.E. 257 (1935). *See also, Watkins v. Commonwealth,* 287 S.W.2d 416 (Ky. 1956); *Gray v. State,* 10 Md. App. 478, 271 A.2d 390 (1970); *State v. Hawkins,* 418 S.W.2d 921 (Mo. 1967); *State v. Sawyer,* 224 N.C. 61, 29 S.E.2d 34 (1944); LaFave & Scott, *Handbook on Criminal Law* p. 698 (1972); 67 Am.Jur.2d *Robbery* § 20 (1973); Note,

---

be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than ten years. If any person commit, or attempt to commit, a robbery in any other mode or by any other means, except as provided for in the succeeding paragraph of this section, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than five nor more than eighteen years."

*Robbery–Putting In Fear*, 24 Minn. L.Rev. 708 (1940). There were no degrees or grades of common law robbery.

W.Va. Code, 61-2-12, enacted in 1931, divides robbery into two separate classes and calls for different penalties: (1) robbery by violence or by the use of a dangerous weapon, and (2) all other robberies.[2] By dividing robbery into these two categories, our legislature joined a number of other legislatures in recognizing a greater culpability and more severe punishment for a robbery committed by violent means than for a robbery committed by nonviolent means.[3] 67 Am.Jur.2d *Robbery* §§ 3 and 4 (1973).

Prior to the 1931 revision of our Code, our robbery statute made the distinction between committing a "robbery being armed with a dangerous weapon" and any other robbery. The penalty for a robbery with a dangerous weapon was not less than ten years. The penalty for robbery committed by other means was not less than five years.[4] Because our pre-1931 statute made only one exception to the common law crime of robbery, that of being armed with a dangerous weapon, most of our cases continued to define robbery in common law terms. *E.g., Franklin and Ponto v. Brown, Warden*, 73 W. Va. 727, 81 S.E. 405 (1914); *State v. McAllister*, 65 W. Va. 97, 63 S.E. 758 (1909); *State v. McCoy*, 63 W. Va. 69, 59 S.E. 758 (1907).

Furthermore, prior to 1931, the use of the terms "armed" and "unarmed" to define the categories of robbery may have been justified since "armed with a deadly weapon" was the sole statutory distinction between the two classes

---

[2] The statute does not label the two categories of robbery. *See*, note 1, *supra*.

[3] Under W.Va. Code, 61-2-12, robbery by violence carries a penalty of ten years to life. A nonviolent robbery carries a penalty of five to eighteen years.

[4] W.Va. Code, Chapter 144, § 12 (1923), states:

"If any person commit robbery, being armed with a dangerous weapon, he shall be confined in the penitentiary not less than ten years; if not so armed, he shall be confined therein not less than five years."

A brief history of the amendments made to the robbery statute is contained in *State v. Rollins*, 142 W. Va. 118, 94 S.E.2d 527, 530 (1956).

of robbery. However, it is clear that after the 1931 amendment to our robbery statute, the terms "armed" and "unarmed" are no longer accurate. This point has been made in some of our post-1931 cases but there has been no serious attempt to abandon this terminology. *E.g., State v. Cunningham,* 160 W. Va. 582, 236 S.E.2d 459, 461 (1977); *State ex rel. Vandal v. Adams,* 145 W. Va. 566, 569, 115 S.E.2d 489, 490 (1960).[5]

The 1931 change to our robbery statute clearly broadened the acts which the statute categorized as aggravated.[6] We believe that these acts should be called "aggravated" robbery since they do not relate solely to whether the defendant is armed. Such acts include robbery by "partial strangulation or suffocation or by striking or beating or by other violence to the person, or by the threat or presenting of firearms or other deadly weapon or instrumentality, whatsoever." W.Va. Code, 61-2-12.

The question which we must address is what type of acts make up the second category of acts which our statute defines as "robbery in any other mode," and which we now identify as "nonaggravated" robbery. It does not appear that we have had an occasion to discuss this question in any depth. The purpose of our robbery statute is to identify those means of committing robbery which are more aggravated in the sense that they are likely to produce bodily injury to the victim. These more aggravated acts carry a potentially heavier penalty. In analyzing the statutory acts which constitute aggravated robbery, all of them involve actual violence to the person

---

[5] The reason for perpetuating this misnomer may be that W.Va. Code, 62-9-6, which sets out the statutory indictment forms for robbery, uses the term "being armed with a dangerous and deadly weapon." This indictment form was placed in the 1931 Code by the revisers but they apparently did not recognize that they had changed the statutory robbery language to broaden aggravated robbery beyond the acts of being armed with a deadly weapon. W.Va. Code, 61-2-12 (1931).

[6] We also recognize that in 1939, W. Va. Code, 61-2-12, was amended by adding a second paragraph relating to bank robbery which contains a complete definition of the crime and, therefore, has no bearing on the issues in this case.

except the act involving the "threat or presenting of firearms or other deadly weapon or instrumentality."

We previously noted that under the common law definition robbery could be committed by two general means. The first was by force and violence to the person, in which event there is no necessity to prove that the victim was placed in fear of bodily injury, since the actual force on the victim can be presumed to have engendered fear. *Thomas v. State,* 183 So.2d 297 (Fla. 1966); *State v. Ray,* 354 S.W.2d 840 (Mo. 1962), *cert. denied,* 371 U.S. 868, 83 S.Ct. 129, 9 L.Ed.2d 104; *State v. Ball,* 339 S.W.2d 783 (Mo. 1960); *Tones v. State,* 48 Tex. Crim. App. 363, 88 S.W. 217 (1905). *Cf., State v. Alvis,* 116 W. Va. 326, 180 S.E. 257 (1935).

The second common law means of committing robbery was through intimidation, that is, by placing the victim in fear, usually of bodily injury. It is this second category under the common law definition which encompasses our nonaggravated form of statutory robbery. Therefore, the distinguishing feature of a nonaggravated robbery is that it is accomplished, not through violence to the victim or the threat or presentation of firearms or other deadly weapon or instrumentality, but through intimidation that induces fear of bodily injury in the victim.[7] In the case of an aggravated robbery, fear of bodily injury is not an essential element of the crime, since the actual physical force or violence or threat or presentation of firearms or other deadly weapon or instrumentality can be presumed to have created fear of bodily injury.[8]

---

[7] An appropriate charging portion of an instruction for "nonaggravated" robbery would be:

"Nonaggravated robbery is defined as the unlawful taking and carrying away of money or goods from the person of another or in his presence, without force or violence but by putting the victim in fear of bodily injury and with intent to steal the property."

[8] An appropriate charging portion of an instruction for "aggravated" robbery would be:

"Aggravated robbery is defined as the unlawful taking and carrying away of money or goods from the person of another, or in his presence, by the use of force or violence on the victim or through the use of a dangerous or deadly weapon or instrumentality, and with the intent to steal such property."

We accept the fact that the terminology of "armed" and "unarmed" robbery has become deeply ingrained in our law. It may take time to abandon the use of these terms and substitute "aggravated" and "nonaggravated" robbery. We do not hold today that the mere use of the terms "armed" and "unarmed" robbery in an instruction will result in reversible error. Moreover, we recognize that in the past this Court has accepted instructions which have defined "aggravated" or "armed" robbery in common law terms, that is, by use of the phrase "by force and violence *or by putting the victim in fear.*" (Emphasis added) *E.g., State v. Hudson,* 157 W. Va. 939, 943, 206 S.E.2d 415, 419 (1974); *State v. Davis,* 153 W. Va. 742, 757, 172 S.E.2d 569, 578 (1970).

This definition is incorrect under our robbery statute classifications which have changed the common law rule. The defendant at common law received the same punishment whether he committed the robbery by violence on the victim or by putting him in fear since at common law there were no degrees of robbery. However, as we recognized earlier, the distinguishing feature between aggravated and nonaggravated robbery under our current robbery statute is that the former requires the utilization of physical force or the use of a deadly weapon against the victim; the latter crime requires only that the victim be placed in fear of bodily injury.

To instruct the jury on aggravated robbery by telling them, as in the *Davis* case, *supra,* that such a robbery can be committed by use of force and violence *or* by placing the victim in fear of bodily injury may result in confusing the jury and may lead to reversible error. Where the evidence clearly demonstrates that the defendant only threatened the victim with bodily injury and thereby placed him in fear, and no firearm or other deadly weapon is involved,[9] the giving of a *Davis*-type instruction is not warranted. If

---

[9] It is clear under our robbery statute that a firearm or other deadly weapon does not have to be used on the victim, its threatened use or presentation is sufficient to constitute aggravated robbery. *State v. Young,* 134 W. Va. 771, 61 S.E.2d 734 (1950).

such instruction is given and the defendant is convicted on aggravated or armed robbery, reversal is called for. The reason is that the *Davis* instruction states that the defendant can be convicted of armed robbery if he places the victim in fear of bodily injury. This is incorrect law under our robbery statute which makes this act nonaggravated or unarmed robbery.

Where the evidence is clear, as in the present case, however, that the robbery was committed by the use of physical violence on the victim or the presentation of a deadly weapon, we will treat the phrase "by placing the victim in fear," in a *Davis*-type instruction, as surplusage and not reversible error since fear is not a necessary element of aggravated robbery.

Finally, in cases where the evidence is in substantial conflict concerning whether the defendant used violence or a dangerous weapon on the victim, and a *Davis*-type instruction is given permitting the jury to find aggravated robbery if the victim is merely placed in fear of bodily injury, such instruction will be held to constitute reversible error. The reason for reversal is that with the evidence in substantial conflict on whether physical force or a dangerous weapon was used, which are the acts constituting aggravated robbery, the jury might well determine to convict on aggravated robbery even though they believe that no force was used upon the victim because the *Davis*-type instruction defines aggravated or armed robbery by the use of force *or* by placing the victim in fear. It is impossible to state with any certainty under these circumstances that the confusion in the *Davis*-type instruction did not contribute to a jury verdict of aggravated robbery.

In *State v. Romine*, ___ W. Va. ___, 272 S.E.2d 680 (1980), we held that the inability to determine if an error in an instruction did not contribute to the conviction requires a reversal of the case. *Cf. State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55, 59-63 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980).

In the present case, there is no dispute that the robbery was committed by violence to the person of the victim. In the course of grabbing the victim's purse, the defendant knocked the victim backwards and she fell onto an iron post. The defendant and his witnesses did not deny this version of how the crime was committed. Instead, the defendant relied upon the defense alibi and testified he purchased the ring from someone at a bar. While the challenged instruction does contain the confusing *Davis*-type language for armed robbery ("or by putting the person in fear,") this will not, under our foregoing test, constitute reversible error.

## II.

Defendant argues that the victim's in-court identification of him as her assailant was inadmissible because that identification was based on an impermissibly suggestive pretrial photographic identification.

On January 18, 1979, fifteen days after the incident, the victim was shown approximately eight photographs of black men. She was unable to identify any of these men as her assailant. The next day, January 19, 1979, a police officer returned to the victim's shop with eight more photographs. This time the victim identified the man in the fourth photograph–Garland Wade Harless–as her assailant.

Defendant contends this photographic identification was inherently suggestive because several of the photographs shown to the victim did not match his physical appearance.

Defendant received an *in camera* hearing on the admissibility of the pending in-court identification. *State v. Watson*, ___ W. Va. ___, 264 S.E.2d 628 (1980). The trial court, after reviewing the photographs, concluded that there was a sufficient similarity of features among the other black males depicted in the photographic array to prevent the array from being impermissibly suggestive. This parallels the test contained in *Simmons v. United*

*States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968), where the Supreme Court stated:

> "[A] pretrial identification by photograph will be set aside ... if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

As *Simmons* also observes, the impermissible suggestiveness of a photographic array may arise not only from the photographs themselves but the manner in which they are presented to the identifying witness. In *Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court proceeded to hold that even though there was an impermissibly suggestive pretrial photographic array, an in-court identification could be made if the identifying witness had a reliable basis for making an identification of the defendant which basis was independent of the tainted pretrial identification procedures. *Manson* employed the five factor test from *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and which we adopted in *State v. Casdorph*, 159 W. Va. 909, 230 S.E.2d 476 (1976).[10] In *Manson*, however, the Court admonished that the five factor test for an independent basis of identification was not absolute: "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." 432 U.S. at 114, 53 L.Ed.2d at 154, 97 S.Ct. at 2253.

---

[10] Syllabus Point 3 of *Casdorph* states:

"In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

In the present case, the only contention made about the photographic array is that all eight of the photographs were not fairly representative of the physical appearance of the defendant. Most courts have concluded that a photographic array will not be deemed excessively suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features. The fact that some of the photographs are dissimilar to the defendant's appearance will not taint the entire array. *United States v. Osborne,* 482 F.2d 1354 (9th Cir. 1974); *United States v. Kimbrough,* 481 F.2d 19 (2nd Cir. 1973); *United States v. Lee,* 459 F.2d 1365 (D.C. 1972); *United States v. Fitzpatrick,* 437 F.2d 19 (2nd Cir. 1970); *Conyers v. United States,* 309 A.2d 309 (D.C. App. 1973); *Sheppard v. State,* 404 N.E.2d 1 (Ind. 1980); *Com. v. Napolitano,* 393 N.E.2d 338 (Mass. 1979); *State v. Wettstein,* 28 Utah 2d 295, 501 P.2d 1084 (1972); *cf., People v. Thornton,* 62 Mich. App. 763, 233 N.W.2d 864 (1975).

The photographs in this case were incorporated in the appeal record and after review we conclude the trial court was correct in permitting the victim to make an in-court identification of the defendant.[11]

### III.

Defendant's final argument is that the trial court refused to permit an attempted impeachment of the victim based on certain statements she allegedly made at the *in camera* hearing. Her statement was to the effect that she was not sure whether the defendant had a mustache because she was looking at his eyes. We find from a review of the record that defense counsel was able to cross-examine her on this matter.[12] Her testimony in this regard

---

[11] Because the trial court found the photographic array not to be so tainted as to require suppression of an in-court identification, it was unnecessary to make the further inquiry of whether the identifying witness had an independent basis for making identification other than the impermissible pretrial identification procedure. Syllabus Point 3, *State v. Casdorph,* 159 W. Va. 909, 230 S.E.2d 476 (1976).

[12] The pertinent portion of the record states:

substantially followed what she stated at the *in camera* identification hearing. We find this point to be without merit.[13]

For the foregoing reasons, the judgment of the Circuit Court of Cabell County is affirmed.

*Affirmed.*

---

"Q Okay. I have asked you previously under oath whether or not that the man that assaulted you had a mustache or beard and can you tell the jury what your response to that question is?

"A I said that I did not—if there was, it was not visible to me.

"Q Is that what you said under oath?

"A I don't know exactly the right words. I did not see the beard and mustache on him.

"Q Did you not tell me you didn't know whether or not he had a beard or mustache because of your looking from here up to identify him? You were looking at his eyes?

"A That isn't the way I stated it, no sir.

"Q How did you state it?

"A Well, if I can remember the question that you asked me, if he had a beard or mustache and I said not that I could tell, not visible to me, and that I did see him from his eyes up when I was watching him coming back at me is what I said."

[13] We have recently discussed the general principles surrounding impeachment of witnesses in *Addair v. Bryant,* ___ W. Va. ___, 284 S.E.2d 374 (1981).