338 S.E.2d 365

**STATE of West Virginia**

v.

**Joel Lane COMBS**

No. 16661.

Supreme Court of Appeals of
West Virginia.

Dec. 12, 1985.

J.W. Feuchtenberger, Hugh C. Wood, Kwass, Stone, McGhee, & Feuchtenberger, Bluefield, for appellant.

Charles G. Brown, Atty. Gen., Bethany Boyd, Asst. Atty. Gen., Charleston, for appellee.

PER CURIAM:

Joel Lane Combs appeals from his conviction of aggravated robbery in the Circuit Court of Mercer County. The appellant was indicted on February 14, 1984 and charged with the aggravated robbery of Marcia Collins, on October 20, 1983, "by threatening the use of a gun" and taking $45.00 from Ms. Collins. The appellant was convicted on May 31, 1984, and was sentenced to a term of 12 years in the state penitentiary.

The appellant contends (1) that the evidence did not warrant a jury instruction on aggravated robbery; (2) that the trial court erred in refusing to suppress evidence of a suggestive pre-trial line-up identification; and (3) that portions of the State's cross-examination and closing argument constituted misconduct. We find no merit in these contentions and therefore affirm the conviction.

Marcia Collins, the owner of the Oakvale Quick Stop, was the victim of a robbery at about 8:30 p.m. on October 20, 1983. The robber entered the store and fetched a six-pack from the beer cooler. He walked toward the counter where Collins was standing, stuck his hand in his jacket pocket, and said, in a high-pitched voice, "Give me all your money." Collins took $45 from the cash register and handed it to the robber, who ordered her to lie down on the floor and threatened her by saying, "If you don't lay down on the floor and if you don't want to die, don't move." He then left the store.

Collins recognized her assailant as the same person who had been in the store on two prior occasions, once for a few seconds earlier the same day, and earlier in the month when he, Collins, and Rose Thomas shot pool together.

Collins called the State Police and when Corporal Paul E. Wriston arrived, she described her assailant as a bearded male with a high voice, between 5'4" and 5'6" tall, weighing 150 pounds and wearing work boots, ragged Levi pants and a jacket. He had a ball cap pulled low over his forehead and generally had a dirty appearance.

Collins also spoke to Rose Thomas, believing that Ms. Thomas might be able to supply the man's name. Although there is no doubt that the defendant was the same person with whom Thomas and Collins played pool, Thomas did not know his real name.

Corporal Wriston, along with other officers, searched the vicinity and within a short time found the appellant standing next to a pick-up truck about two-tenths of a mile from the Quick Stop. Wriston thought the appellant closely matched Collins' description of the robber's height and voice. However, it appeared to Wriston that the appellant had just shaved since he had blood on his face and a patch of hair about a half to three-eighths of an inch long that Wriston believed had been missed by the razor. The appellant, who was hatless, was wearing brown trousers and a striped shirt.

The appellant was subsequently taken to State Police headquarters where a line-up

was conducted. The seven participants were each asked to speak the words, "If you don't lay down on the floor and if you don't want to die, don't move." Collins identified appellant as the man who robbed her. She also identified his boots as the ones worn by the robber. Prior to trial, the appellant moved to suppress evidence of the line-up and to prevent an in-court identification by Marcia Collins. On the first day of the trial, an *in camera* hearing was held immediately after the jury was impanelled. The trial judge, finding no suggestiveness or other indicia of unreliability in the line-up identification, denied the motion.

At trial Collins positively identified the appellant as the robber. She also testified about having picked him out of the line-up. Rose Thomas identified the appellant as the man with whom she and Collins had played pool. Corporal Wriston testified that the appellant was five feet, six inches tall and weighed 150 pounds.

The appellant took the stand in his own defense and testified that he had worked all day with his brother-in-law (Wayne Sprinkles) and his brother-in-law's brother (William "Bugs" Sprinkles) building a room addition to his sister's house; that he stopped work about 7:30 p.m., changed his clothes and shaved; that he and Bugs went out for beer, found one store closed, and were on their way to another when the truck broke down. A friend drove them to a store where they purchased gas and beer. They returned to the truck and were siphoning gas into the stalled pick-up when the police arrived.

The appellant testified that he did not go to the Quick Stop that evening but had been there on a previous occasion to shoot pool. He further testified that he had not worn a beard for one and a half years.

The appellant's sister (Kathy Sprinkles), Wayne and Bugs all corroborated the appellant's testimony that he had worked all day on October 20, 1983, and that he did not recently have a beard. Bugs also testified about traveling with the appellant in search of beer and then running out of gas.

He said they did not go to the Quick Stop because of its high prices for beer.

In rebuttal, Collins testified that when she played pool with the appellant prior to the robbery, he wore a full beard approximately one-half inch in length.

### Aggravated Robbery Instruction

▮ The appellant contends that the evidence was insufficient to support the giving of an instruction on aggravated robbery, arguing that an aggravated robbery by threatening the use of a gun cannot be proven unless it is established that a gun was actually used. The victim of the robbery testified that the robber put his hand in a pocket and made a gesture that caused her to believe that the robber had a concealed gun, but that she did not actually know what, if anything, was in the appellant's pocket.

Our robbery statute, *Code*, 61–2–12 [1961], provides in pertinent part:

If any person commit, or attempt to commit, robbery by partial strangulation, or by striking or beating, or by other violence to the person, or by the threat or presenting of firearms, or other deadly weapon or instrumentality whatsoever, he shall be guilty of a felony, and upon conviction shall be confined in the penitentiary not less than ten years.

Syllabus point 1 of *State v. Young*, 134 W.Va. 771, 61 S.E.2d 734 (1950) states:

Under Code 61–2–12, one who enters a home or place of business of another and makes a gesture indicating that he has in possession a firearm or other deadly weapon, immediately orders the person or persons there in charge to take a certain position, remain there, and not follow him, and then takes physical possession of money or other things of value then on said premises and in the control of the person or persons in charge thereof, is guilty of armed robbery. The threat of the use of a firearm or other deadly weapon constitutes robbery by putting in fear.

The factual circumstances surrounding the armed robbery in *State v. Young* are nearly identical to those in the instant case.

We concluded in *State v. Young* that a gesture simulating a firearm in one's pocket was equivalent to a "threat of firearms," as contemplated by *Code*, 61–2–12, and was therefore sufficient to establish the element of the crime of armed robbery related to putting the victim in fear by threat of a firearm.

Recently this Court recognized the two classes of robbery inherent in *Code*, 61–2–12: "W.Va. Code 61–2–12, enacted in 1931, divides robbery into two separate classes calling for different penalties: (1) robbery by violence or by the use of a dangerous weapon, and (2) all other robberies." Syl. pt. 1, *State v. Harless*, 168 W.Va. 707, 285 S.E.2d 461 (1981).

■ Class (1) robbery is aggravated robbery; class (2) robbery is nonaggravated robbery. *State v. Harless, supra*, 168 W.Va. at 711–712, 285 S.E.2d at 464–5. The type of robbery that occurred in *State v. Young, supra* (simulation of firearm by gesturing with hand in pocket) was specifically classified as aggravated robbery. *State v. Harless, supra*, 168 W.Va. at 713, n. 9, 285 S.E.2d at 466, n. 9. We therefore disagree with the appellant's contention that *State v. Young* was implicitly overruled by *State v. Harless*.

"An instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it." Syl. Pt. 6, *State v. Hall*, 171 W.Va. 212, 298 S.E.2d 246 (1982). Therefore, the trial court did not err in instructing the jury that they could find the defendant guilty of aggravated robbery.

### Line-up

■ The appellant next contends that because he was the shortest participant in the line-up and Ms. Collins described the robber as short, the line-up was unduly suggestive. Evidence of the line-up, he argues, should therefore have been suppressed. The appellant also challenges the in-court identification by Collins, on the grounds that it was tainted by the suggestive pretrial identification procedure and that the taint could not be cured under the standards of *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976).

Syllabus pt. 3, *State v. Casdorph, supra*, states:

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

In *State v. Boyd*, 167 W.Va. 385, 280 S.E. 669, 678–9 (1981), this Court, in reliance on footnote 9 of *Manson v. Brathwaite*, 432 U.S. 98, 106–7, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140, 149 (1977), applied the totality of the circumstances test, *State v. Casdorph, supra; State v. Stollings*, 158 W.Va. 585, 212 S.E.2d 745 (1975); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), to determine whether evidence of an out-of-court identification should be suppressed.

The evidence here shows that Collins had ample time to view the robber. She testified that she could see his face clearly as she looked up from her position on the floor. She also testified that she had seen him twice previously, at least one of those times for an extended period. Collins' description matched the appellant with respect to height, build, and voice quality. Her identification of the appellant at the line-up, held within an hour and a half of the robbery, was unequivocal, despite the absence of a beard.

We have viewed a black and white photograph, introduced at trial, of the line-up participants. It is obvious that the appellant is the shortest person in the photograph and that four of the seven participants are of considerably larger build than the appellant. However, the two men to

the left of the appellant in the photograph appear to be not so much larger or taller than the appellant as to draw special attention to the appellant's height.* Moreover, all but one of the other participants wore trousers resembling those in Collins' description, and all but one were bearded, another feature of the description. Thus, the line-up participants were fairly representative of the significant features described by the eyewitness. *See State v. Harless, supra,* 168 W.Va. at 717, 285 S.E.2d at 467; *State v. Watson,* 173 W.Va. 553, 318 S.E.2d 603, 612 (1984).

Considering all the circumstances of the line-up procedure, we conclude that the reliability of the identification far outweighed any suggestiveness. Thus, the trial judge properly ruled that the evidence of the line-up was admissible. Having found nothing impermissible in the line-up identification, and thus nothing to taint the in-court identification, it is unnecessary to consider whether the in-court identification by Collins had an independent basis. *State v. Harless, supra,* 168 W.Va. at 717, 285 S.E.2d at 467, n. 11; *State v. Watson, supra,* 173 W.Va. at 562, 318 S.E.2d at 613.

### Prosecutorial Misconduct

■ Finally, the appellant contends that the court erred in overruling objections to the cross-examination of Kathy and Bugs Sprinkles concerning their failure to inform the police prior to trial that the appellant was with them at the time of the crime and that the appellant did not have a beard; and also erred in overruling an objection to the prosecuting attorney's comment during closing argument with respect to the failure of these witnesses to inform the police of the appellant's alibi.

Relying on *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977), the appellant argues that these prosecutorial tactics constituted misconduct of a magnitude warranting reversal. Syllabus point 3 of *State v. Boyd, supra,* states:

The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial. It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law.

In *Boyd,* however, we dealt with the prosecutor's cross-examination of the defendant as to his failure to disclose an exculpatory story to the police while in custody prior to trial. We held, in reliance on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) that such conduct violated the defendant's privilege against self-incrimination. *State v. Boyd, supra,* 160 W.Va. at 240-1, 233 S.E.2d at 715-16. *See State v. Oxier,* 175 W.Va. 760, 338 S.E.2d 360 (1985).

Here we are dealing with impeachment, not of the defendant, but witnesses whose rights against self-incrimination were not implicated. Other courts have clearly indicated this to be permissible with witnesses other than the defendant. *People v. Dawson,* 50 N.Y.2d 311, 428 N.Y.S.2d 914, 406 N.E.2d 771, 20 A.L.R.4th 232 (1980); *State v. Sands,* 123 N.H. 570, 612, 467 A.2d 202, 228-9, 37 A.L.R.4th 904 (1983); *Commonwealth v. Rogers,* 472 Pa. 435, 372 A.2d 771, 782 (1977); Annot., 20 A.L.R.4th 245. *See also State v. Crockett,* 164 W.Va. 435, 265 S.E.2d 268, 270 (1979).

In *Dawson,* the New York Court of Appeals said:

We note at the outset that we agree in principle with the general proposition, advanced in many of the Appellate Division decisions, that, absent a specific legislative directive, a citizen ordinarily has no legal obligation to volunteer exculpatory

---

* For cases from other jurisdictions, where disparity in height has been determined to be not unnecessarily suggestive, *see U.S. ex rel Pella v. Reid,* 527 F.2d 380, 384 (2d Cir.1975); *State v. Newman,* 326 N.W.2d 788, 794 (Iowa 1982); *Washington v. State,* 273 Ark. 482, 484-5, 621

S.W.2d 216, 217 (1981); *Garcia v. State,* 563 S.W.2d 925, 929 (Tex.Crim.1978); *People v. Rist,* 16 Cal.3d 211, 218, 127 Cal.Rptr. 457, 461-2, 545 P.2d 833, 838 (1976); *State v. McCollum,* 211 Kan. 631, 636-7, 507 P.2d 196, 202 (1973).

information to law enforcement authorities. [footnote omitted] Indeed, even if the existence of such an obligation were compatible with our system of government, it could not form the basis of a meaningful rule of law, since the difficulties involved in enforcing the duty could prove to be insurmountable (cf. *United States v. New York Tel. Co.*, 434 U.S. 159, 176–176, n. 24, 98 S.Ct. 364, 374 n. 24, 54 L.Ed.2d 376). In the absence of any such legal duty, the decision whether to volunteer exculpatory information to the police regarding a particular suspect must remain a matter of individual conscience and private choice. Accordingly, it would be improper for a District Attorney to suggest through his questioning that a witness has a flawed moral character or is generally unworthy of belief solely because he or she failed to come forward prior to the trial.

It does not necessarily follow, however, that an individual's previous silence may never be used as a basis for impeaching his testimony at trial. Whether or not a private citizen has a legal obligation to volunteer information, there exists a wide variety of situations in which the natural impulse of a person possessing exculpatory information would be to come forward at the earliest possible moment in order to forestall the mistaken prosecution of a friend or loved one. In such situations, the failure to speak up at a time when it would be natural to do might well cast doubt upon the veracity of the witness' exculpatory statements at trial.

50 N.Y.2d at 317–18, 428 N.Y.S.2d at 918–19, 406 N.E.2d at 775.

None of the questions or comments of the prosecuting attorney implied the existence of a legal duty to come forward and disclose exculpatory information prior to trial. The defense witnesses were simply asked why they had not volunteered the exculpatory information to the police. The challenged portion of the prosecuting attorney's closing argument was nothing more than a recapitulation of the testimony of the alibi witnesses, coupled with a permissible comment concerning credibility. Clearly, there was no misconduct on the part of the prosecuting attorney.

Accordingly, the judgment of conviction entered in the Circuit Court of Mercer County is affirmed.

Affirmed.