394 S.E.2d 42

**STATE of West Virginia**

v.

**Terry Lee RUGGLES.**

**No. 19105.**

Supreme Court of Appeals of West Virginia.

May 17, 1990.

G. Richard Bunner, Fairmont, for Terry Lee Ruggles.

J. Montgomery Brown, Pros. Atty., Fairmont, for State of W.Va.

BROTHERTON, Justice:

This case involves an appeal brought by Terry Lee Ruggles appealing the first-degree murder conviction and subsequent life sentence with possibility of parole.

On December 29, 1985, Leonard Thrash was found dead in his Fairmont, West Virginia, home, curled up on the floor by a stereo speaker. A shotgun was laid across his legs and a bullet wound was found going through his eye socket into the stereo speaker on the floor behind his head. Another bullet hole was discovered in an outside wall of the house. Investigation revealed that money in excess of $300 had been removed from Thrash's wallet.

Later that day, Fairmont detectives reviewed a report which charged the appellant, Terry Lee Ruggles, with a second offense driving under the influence of alcohol (DUI). Ruggles was placed in the Marion County Jail. When Mr. Ruggles was brought to the police station, one of the detectives advised him that his brother-in-law, Leonard Thrash, was dead. Mr. Ruggles responded "Yes, I know, I shot him." The appellant was immediately advised of his *Miranda* rights, which he waived. The appellant then gave an oral statement to

the detective, in which he stated that he was depressed and attempted suicide over a late unemployment check. Ruggles claimed that he wrestled with Thrash over the shotgun when Thrash tried to prevent the suicide, and the gun accidentally went off, killing Leonard Thrash. The appellant admitted to the police that he took the money from the decedent after the shooting, left the house, and went to a restaurant/bar alternately known as the Bird's Nest or Crow's Nest. The appellant was charged with the death of Leonard Thrash.

However, contrary to his earlier statement, the appellant testified at trial that he left the house after the shooting and went to the bar before returning to Mr. Thrash's house to take the money, alleging that he wanted to buy more shotgun shells. The appellant ordered dinner at Georgia's restaurant about 6:00 p.m. However, he did not have the money to pay for the meal. At approximately 7:30 p.m., he checked into the Holiday Inn and paid cash for his room. Later in the evening, the appellant returned to the Crow's Nest and bought three rounds of drinks for the whole bar, spending approximately $75 to $100, and tipping the barmaid $20. At that time, a witness noticed that he had blood on his sleeve. At 2:15 a.m., the appellant was arrested on a separate offense for DUI. At that point, he had in his possession $291. However, the appellant claimed to recall little or nothing of the rest of the evening except for returning to Leonard Thrash's house and again attempting suicide. However, he said he lost his nerve and shot a hole through the wall.

A jury trial was held on May 5 and 6, 1987. During the trial, there was conflicting evidence as to the degree of the appellant's intoxication. The appellant and his expert witness, Dr. Thomas Haymond, a physician specializing in chemical abuse cases, testified that he was so intoxicated that he may not have had the ability to form intent. The appellant claimed the shooting was accidental.

The State countered that the evidence upon which Dr. Haymond based his opinion was an alcohol influence report of the appellant's consumption hours after the killing had occurred.[1] Dr. Haymond testified that he could not tell "how much alcohol [the appellant] had to drink between 9:00 a.m. and shortly before 8:00 p.m. as opposed to shortly before 8:00 p.m. and 2:00 a.m."

The proprietor of the Crow's Nest, Jim Tiano, testified at trial that he had known the appellant for fifteen years and claimed that the appellant's conduct on that night was different from any other night. Mr. Tiano said that the appellant was acting angry and belligerent and threatened the barmaid, specifically threatening to shoot the bar owner. Evidence was introduced that the appellant was a chronic alcoholic.

Mr. Tiano also stated that he could not say to what degree the appellant was intoxicated, although he knew he had been drinking. Edward Kerns, who was with the appellant at the bar and in his car, stated that he knew the appellant had been drinking, but did not think he was drunk. Likewise, Bobbi Radcliff, who also accompanied the appellant from the Crow's Nest to his car, could not say if the appellant was drunk, but did observe that aside from driving his car too fast, he had good control of the automobile and did not stumble around the bar. The barmaid, Carol Goudie, observed that the appellant had a few drinks, but appeared to be sober. The registrar at the Holiday Inn stated that she could tell that the appellant had alcohol on his breath, but did not believe he was very intoxicated, as it was the Holiday Inn policy to deny registration to persons whom they believed to be significantly intoxicated. Finally, Officer David Mugnano, the Fairmont City Police officer who arrested the appellant on the DUI charge, testified that although the appellant was driving in a reckless manner given the road conditions, he felt the appellant was a pretty good driver or he would have wrecked the

1. The alcohol influence report was the result of the DUI arrest at approximately 2:15 a.m., several hours after the death of Leonard Thrash.

vehicle. Since the appellant refused the intoxilyzer test, there is no way to know the quantifiable degree of intoxication at 2:15 a.m., although the officer testified that, in his experience, he believed it would have been in excess of the .10 limit for DUI.

On June 25, 1987, Ruggles was convicted of first-degree murder and sentenced to life imprisonment with the possibility of parole. On appeal, the appellant raises several assignments of error, including nineteen separate assignments of error in the jury instructions.

Specifically, the appellant contends that the trial court and defense counsel erred in offering second-degree murder and voluntary manslaughter in the jury verdict form and not including in the same verdict form the possible verdict of larceny. The appellant claims that, as related to the charge of felony-murder, the inclusion of the two and the exclusion of larceny confused the jury regarding their alternatives, the element of intent, and the nature of the charges in the indictment.

Secondly, the appellant contends that the trial court erred in refusing the petitioner's motion for a judgment of acquittal based on the insufficiency of the evidence and in refusing the petitioner's alternate motion to set aside the verdict and grant a new trial based upon the testimony of the prosecution's expert, Dr. James Frost, who offered what the appellant considered to be an expert opinion as to ballistics, projectory motion, physical construction, and other matters the appellant contends to be outside his area of expertise.

Next, the appellant contends that he was prejudiced because of the limitation of payment of expert witnesses for indigent defendants. The appellant's expert, Dr. Thomas Haymond, was unable to sit through the entire trial and the appellant contends he was unable to hear all the relevant testimony regarding the key defense theory of intoxication and intent. Thus, the appellant argues he was denied due process and equal protection of the law under the Constitutions of the United States and West Virginia, which resulted in the denial of a fair trial. In a related charge, the appellant contends that because of the limitation of payment for Dr. Haymond, the defense was forced to call Dr. Haymond out of the proper sequence, contrary to his trial strategy. The appellant argues that the resulting unfairness, coupled with the related allegation, was prejudicial to the appellant.

Finally, the appellant cites numerous allegations of error regarding the jury instructions, but fails to support the allegations with any case law or discussion. We find these remaining assignments of error to be without merit and thus, do not address them.

### I.

The appellant's primary argument revolves around his allegation that the trial court erred in including a second-degree murder and voluntary manslaughter charge and excluding, in the same verdict form, a charge of larceny, a "necessary and critical alternate theory of defense." The appellant claims that the inclusion of second-degree murder and voluntary manslaughter and the exclusion of larceny confused the jury regarding their alternatives and the nature of the charges against the defendant.

The crime of felony-murder is a separate and distinct category of first-degree murder. Felony-murder is defined in W.Va. Code § 61–2–1 (1989) as "murder ... in the commission of, or attempt to commit arson, sexual assault, robbery or burglary, [and] is murder of the first degree...." In *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978), this Court held that in order to sustain a conviction of felony-murder, proof of the elements of premeditation, malice, or specific intent to take a life is not required. Instead, the State is required to show the following elements: (1) commission of or attempt to commit one or more of the enumerated felonies; (2) the defendant's participation in the commission or attempt of one of the enumerated felonies; and (3) the death of the victim as a result of the injuries received during the course of the commission or attempt. *See State v.*

*Williams,* 172 W.Va. 295, 305 S.E.2d 251, 267 (1983).

In *State ex rel. Hall v. Strickler,* 168 W.Va. 496, 285 S.E.2d 143 (1981), we held that robbery is a lesser included offense of felony-murder if a conviction for the greater offense, felony-murder, could not be had without conviction for the lesser crime, robbery.[2] At common law, robbery is defined as

(1) the unlawful taking and carrying away, (2) the money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods.

Syllabus point 1, *State v. Harless,* 168 W.Va. 707, 285 S.E.2d 461 (1981). *See also State ex rel. Vandal v. Adams,* 145 W.Va. 566, 115 S.E.2d 489 (1960).

 This Court further defined robbery in *State v. Neider,* 170 W.Va. 662, 295 S.E.2d 902 (1982), noting that "[w]e have in the past recognized that our robbery statute must be read in conjunction with the common law elements of larceny." *Id.* at 907. Referring to syllabus point 3 of *State v. Louk,* 169 W.Va. 24, 285 S.E.2d 432 (1981), we reiterated the common law definition of larceny:

"To support a conviction for larceny at common law, it must be shown that the defendant took and carried away the personal property of another against his will and with the intent to permanently deprive him of the ownership thereof."

*Neider,* 170 W.Va. at 667, 295 S.E.2d at 907. To maintain a charge of robbery at common law, the same elements of larceny

are required, but with the inclusion of two additional elements: "[t]he taking has to be from the person of another or in his presence and such taking has to be by force or putting the person in fear." *Id.* Thus, the *Neider* Court concluded that larceny was a lesser included offense of robbery, and determined that "where there is no evidentiary dispute or *insufficiency on the elements of the greater offense* which are different from the elements of the lesser included offense, then the defendant is not entitled to a lesser included offense instruction." *Id.* at 906. (Emphasis added.)

 In the case now before us, we find no insufficiency on the elements of the greater offense, robbery, which would require the giving of the lesser included offense instruction.[3] Regardless of the fact that the victim might have been dead at the time the robbery occurred, the jury found the defendant guilty of felony-murder, obviously finding that the taking was by force. In *State v. Wayne,* 169 W.Va. 785, 289 S.E.2d 480 (1982), this Court adopted the rule that in order for the felony-murder statute to apply, the initial felony and the homicide must be part of a continuous transaction, closely related in point of time, place, and causal connection for the felony-murder statute to apply. *Id.* at syl. pt. 2. Given the defendant's early statements to the police that he took the money before he left the house, we believe that the State provided sufficient evidence for the jury to find a continuous transaction and causal connection between the homicide and the intent to rob Mr. Thrash of the money.[4]

---

**2.** The crime of robbery is set out in W.Va.Code § 61–2–12:

If any person (a) by force or violence, or by putting in fear, feloniously takes, or feloniously attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management or possession of, any bank, he shall be guilty of a felony ...; and if any person (b) in committing or attempting to commit, any offense defined in the preceding clause (a) of this paragraph, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, he shall be guilty of a felony....

**3.** By giving the jury the option of larceny, the appellant potentially removes felony-murder as a verdict since larceny is not one of the underlying felonies required by statute to establish felony-murder. It is only upon appeal that the appellant puts forth the argument that the elements necessary for robbery cannot be maintained since Mr. Thrash was dead when the money was taken, thus negating the requirement that the taking be against his will, by force, or by putting him in fear.

**4.** Contrary to the appellant's allegations that exclusion of a larceny instruction made the jury unaware and unwilling to find the defendant not guilty, we note that the court instructed the jury that if they did not believe he had formed

In *State v. Green,* 157 W.Va. 1031, 206 S.E.2d 923 (1974), this Court held that when there is competent evidence to support a theory of defense, the court must give the proper instruction presenting the theory to the jury. Conversely, however, it is proper to refuse an instruction where it is repetitious or not supported by the evidence. Syl. pt. 7, *State v. Cokeley,* 159 W.Va. 664, 226 S.E.2d 40 (1976). Moreover, it is the duty of the defense to submit the proper instructions. *See State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146, 151 (1978). In the present case, the appellant did not request a larceny instruction, basing his case on the theory that it could not have been robbery since Mr. Thrash would have given the appellant the money.

■ Furthermore, we find no error in the inclusion of the charges of involuntary manslaughter and second-degree murder. These charges were legitimate options that the jury could have found. In fact, we believe it was to the defendant's advantage that these charges were included, because they gave the jury choices other than first-degree murder. Indeed, if the two charges had not been included, we speculate that the appellant would now be complaining of the lack thereof. Consequently, we find no merit in the appellant's theory that the death of the victim negated the necessary elements of robbery and ultimately, felony-murder, and thus we find no reversible error.

## II.

■ The defendant next argues that there was insufficient evidence to convict him of felony-murder. The appellant seems to allege that because the evidence upon which the conviction was based was circumstantial, lacking in "hard physical evidence," there was insufficient evidence to support the verdict. However, circumstantial evidence may be used to establish a crime if, when considered together, the circumstances are sufficient to convince a jury of the defendant's guilt to the exclusion of every reasonable hypothesis of innocence. *State v. Meadows,* 172 W.Va. 247, 304 S.E.2d 831 (1983); *State v. Knotts,* 156 W.Va. 748, 197 S.E.2d 93 (1973). In the Defendant's Instructions Nos. 4, 6, 8, 9, and 10, the trial court properly instructed the jury that the State must prove the crime charged beyond a reasonable doubt and that circumstantial evidence should be viewed cautiously to sustain a verdict of guilt. *See State v. McHenry,* 93 W.Va. 396, 117 S.E. 143 (1923).

■ In *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978), this Court held:

In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, when the state's evidence is sufficient to convince unpartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent unjustice has been done.

*Id.* at syl. pt. 2. After reviewing the facts presented at trial, we are not convinced the evidence was inadequate to support the conviction or that an "unjustice" has been done.[5] In view of the cautionary instruc-

---

the intent to take the money until after the shooting, then felony-murder is not an option. If you, the jury, believe from the evidence that Terry Lee Ruggles did not form an intent to take money from Leonard Thrash until after . the shooting, a separate and distinct event from the shooting, then you may find him not guilty of the crime charged in the indictment.

5. The defendant claimed he was depressed and attempted suicide because of a lack of money and a late unemployment check. Evidence was also presented that the defendant was aware the decedent, the day before his death, had received a check for $4,500, which he put in the bank, and that he had cashed a check in excess of $300. At trial, the appellant testified that he went to the Crow's Nest, drove around, then went back to the apartment to take the money. However, a year before, he claimed that he took the money before he left, because he didn't have any. Dr. Frost testified that, based upon the wound path, it was most likely that the shot came from above. Finally, testimony was heard that at approximately six o'clock, the de-

tions to the jury, it is clear the jury was aware of the manner in which to consider circumstantial evidence. The State presented evidence of the time, place, and causal connection between the killing and the robbery. *See State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480 (1982). We do not find that the evidence presented was insufficient to support the verdict.

### III.

■■■■■ The appellant next contends that the trial court erred in permitting expert testimony outside an individual expert's field of expertise. Specifically, the appellant contends that because the State's forensic expert, Dr. Frost, testified to the trajectory of the bullet, without being qualified as a ballistics expert, error occurred and a new trial should be permitted. Dr. Frost explained his theory of the path of the bullet through the head of a decedent by demonstrating on a volunteer.

We are not persuaded by this argument. In trial below, the appellant attempted to stipulate to the manner of the victim's death, thus eliminating any testimony as to how the victim died. However, the State refused to accept the stipulation and presented testimony from Dr. Frost. At the same time, however, the appellant stipulated to Dr. Frost's credentials as a "physician, pathologist doing forensic pathology." With that stipulation, he refused the opportunity to question Dr. Frost's expertise, the issue he now brings before this Court. Only after the testimony began did the appellant question Dr. Frost's expertise on the trajectory of the bullet through the victim's body.

After reviewing his testimony, we do not find that Dr. Frost's testimony was outside his field of expertise of forensic pathology. As a forensic pathologist, Dr. Frost special-ized in determining the causes of death in criminal cases. His testimony did not revolve around the characteristics of the gun. Rather, he discussed the condition of the body, the powder stippling and the gun range, the angle of the wound and necessarily the bullet, and the probable immediate consequences of such a wound to the spinal cord by testimony and demonstration on a live model. Moreover, the fact that Dr. Frost demonstrated the path on a live model, rather than merely explaining his opinion by testimony, does not give rise to reversible error.[6] As long as the demonstration is performed circumspectly, without being overly gruesome, and is within the witness's field of expertise, we believe such demonstrations can help the jury understand often complicated or confusing testimony. Thus, we conclude that the testimony complained of by the appellant was within the bounds of Dr. Frost's expertise as a forensic pathologist.

### IV.

■■■■ The appellant next claims that he was denied due process and a fair trial because he could not afford to have his expert sit through the entire trial and hear all relevant evidence on the key defense theory of intoxication and intent, and because he was forced to call Dr. Haymond out of proper sequence. Again, we find this allegation to be without merit. The defense fails to explain why no accommodations were made for the expert, such as taping the "crucial" testimony for Dr. Haymond to hear or providing a transcript of the court proceedings for him to read.

Furthermore, we note that the trial was postponed on one occasion in order to accommodate Dr. Haymond's schedule. The transcript reveals that Dr. Haymond's testimony was taken out of sequence at his

---

fendant did not have money for supper. However, when he checked into the Holiday Inn at 7:30, he had quite a bit of money, which he later spent buying drinks for patrons in the bar. Further, the defendant admitted on cross-examination that Thrash would not give him money to go out and register at a Holiday Inn and buy drinks for the bar.

6. A similar conclusion was reached by the Virginia Supreme Court in *Mackall v. Commissioner*, 236 Va. 240, 372 S.E.2d 759 (1988), where the court held it was proper to allow the medical examiner's insertion of a knitting needle into a styrofoam model of a human head to demonstrate the trajectory of the bullet fired by the defendant since it made it easier for the jury to understand the witness' testimony.

## 66

request because he had obligations the next day.[7] The appellant also fails to present any evidence from the doctor which tends to show that he was unable to fully cooperate because of financial constraints. Most importantly, however, the appellant failed to demonstrate that the outcome was affected by the order of the expert testimony. *See State v. England,* 180 W.Va. 342, 376 S.E.2d 548 (1988); *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974). Thus, we find no error.[8]

For the reasons stated above, we do not find that the trial court committed reversible error. We find that the evidence, when viewed as a whole, is sufficient to support the jury's verdict of felony-murder. Accordingly, we affirm the decision of the Circuit Court of Marion County.

Affirmed.

7. The prosecution also notes that their expert witness, Dr. Frost, was delayed in his appearance and was taken out of order.

8. The appellant also charges that the trial court erred in introducing a photo of the decedent with his granddaughter, alleging that the photo was inflammatory and not probative, contending that a stipulation had been entered into regarding the decedent's identity. However, since we find that no stipulations by the State regarding the decedent's identity nor the manner of death, there was probative value in the photo and we do not find it to be inflammatory.