# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-0894** (Wood County 18-F-95)

**Kenneth L. McCoy, Jr.,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Kenneth L. McCoy, Jr., by counsel F. John Oshoway, appeals his convictions for the felony offenses of first-degree murder, first-degree robbery, burglary, grand larceny, and conspiracy to commit murder. Respondent State of West Virginia by counsel Thomas T. Lampman, filed a response in support of petitioner's convictions and a supplemental appendix.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On December 11, 2017, Penni Jo Curtiss ("victim") was murdered in her home in Parkersburg, West Virginia. Her home was ransacked and many of her belongings (including her vehicle) stolen.[1] The victim's body was discovered, on December 12, 2017, by her parents, who subsequently called 9-1-1. Sgt. James Stalnaker of the Parkersburg Police Department ("PPD") responded to the crime scene with a team of investigators.

As the PPD searched the victim's home, the officers found blood covering the walls, door, furniture, and carpet. Swabs of the blood were collected, the home was "dusted" for latent prints, and the victim's remains were sent to the medical examiner's office for autopsy. Ultimately, Deputy Chief Medical Examiner Dr. Kubiczek determined that the cause of the victim's death was "multiple blunt force injuries of significant conditions" and "multiple sharp force injuries." Dr. Kubiczek further determined the manner of the victim's death to be homicide.

---

[1] The record reflects that the physical attack of the victim began in the late evening of December 11, 2017, at approximately 9:00 p.m.; however, it is unclear if the victim succumbed to her injuries on December 11, 2017, or in the early morning hours of December 12, 2017.

1

During their investigation, the PPD canvassed the victim's neighborhood and discovered that the victim's neighbor had a video surveillance system with a camera on each corner of his home. On December 11, 2017, at approximately 7:24 am, one of the neighbor's cameras "captured a male walking toward the back of [the victim's] porch, dislodging [the] air conditioner, and crawling through the window." The neighbor identified petitioner as the man in the video. Additionally, the neighbor noted that petitioner returned to the victim's home later that morning, carrying a backpack, and had a conversation with Jessica Roberts (petitioner's girlfriend who previously lived at the victim's residence) at the end of the driveway of the victim's home. The neighbor then observed petitioner and Ms. Roberts walk toward the basement door of the victim's home, but the neighbor did not think anything of the midday visit as people, including petitioner and Ms. Roberts, often visited the victim's daughter while the victim was at work.

PPD detectives then interviewed the victim's daughter who advised that she had lived with the victim until December 1, 2017. The daughter advised that Ms. Roberts also lived with her and the victim during the fall of 2017 and that petitioner would sometimes visit Ms. Roberts at the victim's home. Ms. Roberts moved out of the victim's home a few weeks prior to the time the victim's daughter moved out. Based upon the surveillance video and interviews of the victim's neighbor and the victim's daughter, detectives determined that petitioner and Ms. Roberts were suspects in the victim's murder.

On December 14, 2017, in Illinois, Officer Mark Weber and Assistant Chief Drury of the Flora Police Department responded to a complaint about a man in a silver minivan requesting gas money from patrons at a nearby convenience store. By the time that Officer Weber arrived at the convenience store, the vehicle and the man were gone, but were reported to be seen headed in the direction of the local Walmart. Officer Weber then traveled to the parking lot of the Walmart and observed a vehicle matching the description of the vehicle from the convenience store. The vehicle was unoccupied. Officer Weber "ran the [license] plate" through dispatch and the "plate came back as being stolen." Officer Weber then exited his vehicle and looked through the windshield of the minivan at the VIN[2] plate and "called in the number to dispatch." The VIN "came back as being involved in a homicide in West Virginia." Hoping that someone would return to the vehicle, Officer Weber parked his squad car a few rows away and waited. Ultimately, petitioner and Ms. Roberts returned to the vehicle and were arrested.

That same day, Sgt. Stalnaker and Detective Hart of the PPD learned of petitioner's and Ms. Roberts's arrests and traveled to Illinois to "retrieve evidence" gathered as a result of the arrests. On December 15, 2017, while still in Illinois, Sgt. Stalnaker and Detective Hart interviewed Ms. Roberts.[3] Prior to her interview, Ms. Roberts signed a waiver of her *Miranda*[4] rights and voluntarily gave a statement, which detailed the events surrounding the victim's murder

---

[2] Vehicle Identification Number

[3] After returning to West Virginia, Ms. Roberts provided a second statement, on December 27, 2017.

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

and implicated Ms. Roberts and petitioner. During this time, Ms. Roberts also provided the PPD officers with a DNA swab.

In her statement, Ms. Roberts disclosed that on December 11, 2017, petitioner broke into the victim's home and then let Ms. Roberts into the home. Petitioner and Ms. Roberts then waited for the victim to return home from work and, when she entered the home, petitioner "attacked [the victim] with a hammer, striking her forcefully on the head repeatedly, then, covering her head with a pillow, proceeded to cut her throat." Ms. Roberts' admitted that she and petitioner then took various items from the victim's home including credit cards, checks, and the victim's vehicle.

Following the interview of Ms. Roberts, Detective Hart, with the help of the Illinois police, processed the victim's van.[5] The van was found to contain a hammer, a machete, a designer bag with the victim's name on it, a suitcase with petitioner's and the victim's prescriptions in it, the victim's wallet, and cash advance paperwork bearing the victim's name. A pair of black boots belonging to petitioner and stained with what was later determined to be the victim's blood were also found in the vehicle.

The following morning, Sgt. Stalnaker and Detective Hart attempted to interview petitioner. The first interview was terminated when petitioner advised that he did not want to speak to the police because he wanted an attorney. However, petitioner did agree, with no objection or qualification, to provide Sgt. Stalnaker with a DNA swab. As the PPD officers were preparing to leave, they were advised that petitioner had changed his mind and requested to speak to the PPD officers before they left. Petitioner was advised he would have to complete an inmate request and grievance form. Petitioner completed the form and at the inception of his second meeting with the PPD officers, petitioner executed a waiver of his *Miranda* rights and thereafter gave a statement in which he detailed his role in the victim's murder.

Information gleaned through petitioner's interview led to the search of a dumpster at a facility in West Virginia where a backpack belonging to petitioner and certain items from the murder scene and items belonging to the victim were discovered.[6] Additionally, the facility where the dumpster was located provided surveillance footage which depicted a person, matching the description of petitioner, exiting the victim's van and placing items into the dumpster. Several items found in the dumpster or recovered from the victim's van were submitted for latent prints and DNA testing. Blood on petitioner's right boot, the knife, and one of the hammers contained both the victim's and petitioner's DNA.

---

[5] On or about December 15, 2017, Sgt. Stalnaker "made an affidavit before a judge in Flora" to obtain a search warrant for the victim's van. The search was authorized and the PPD officers searched the victim's van and seized "various items of personal property."

[6] Specifically, PPD officers discovered a box cutter, two hammers, a knife, a blood-saturated couch cushion, a bag bearing the victim's name and address, a white trash bag containing a blood-saturated pillow, a blood-saturated piece of blue carpet and carpet padding, a bag containing male clothing, a bag containing female clothing, and a copy of the victim's driver's license and social security card.

3

Though petitioner and Ms. Roberts were arrested on fugitive warrants on December 14, 2017, they were not presented "before a judicial officer" until Monday, December 18, 2017, at which time both waived their right to an extradition hearing and acquiesced to transportation to West Virginia.

On March 7, 2018, petitioner was indicted on counts of murder, first-degree robbery, burglary, grand larceny, and conspiracy to commit murder. Before trial, petitioner moved to suppress any evidence collected in Illinois, including his statement and any evidence collected based on information he provided when giving his statement, on the basis of unreasonable delay in presenting him to a judicial officer. Petitioner's motions were denied. Further, petitioner moved to dismiss his indictment for robbery, arguing that, by definition, no robbery is possible when property is taken from a deceased victim. This motion was also denied.

Petitioner and Ms. Roberts were jointly tried in May of 2019. Neither petitioner nor Ms. Roberts testified at trial, but recordings of their statements were played for the jury. Ultimately, the jury found both petitioner and Ms. Roberts guilty of first-degree murder, first-degree robbery, conspiracy to commit a criminal offense, burglary, and grand larceny.

Subsequently, on August 12, 2019, petitioner was sentenced to a term of life in prison without mercy (first-degree murder); a term of not less than one nor more than five years (conspiracy to commit murder); a term of fifty years (first-degree robbery); a term of not less than one nor more than ten years (burglary); and a period of not less than one nor more than ten years (grand larceny). Petitioner's sentences were to run consecutively with one another with no credit for time served. These sentences were memorialized in the court's August 30, 2019, sentencing order, and it is from this order that petitioner appeals.

On appeal petitioner raises five assignments of error. We generally note that many of petitioner's arguments do not comply with Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure. That rule provides that

> [t]he brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on, under headings that correspond with assignments of error. The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

W. Va. R. App. P. 10(c)(7). Additionally, in an Administrative Order entered December 10, 2012, Re: Filings That Do Not Comply With the Rules of Appellate Procedure, the Court noted that "[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law" are not in compliance with this Court's rules. Further, "[b]riefs with arguments that do not contain a citation to legal authority to support the argument presented and do not 'contain appropriate and specific citations to the . . . record on appeal . . .' as required by rule 10(c)(7)" are not in compliance with this Court's rules. Moreover, as we previously have stated "[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for

truffles buried in briefs." *State, Dep't of Health and Human Res., Child Advocate Office on Behalf of Robert Michael B. v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

In his first three assignments of error, which we will address together, petitioner claims that the circuit court erred in denying his motion to suppress because the PPD officers acted outside of their jurisdictional authority and violated petitioner's constitutional due process rights. In his fourth assignment of error, petitioner contends that the circuit court erred in failing to find an unreasonable delay in the PPD's presentation of petitioner to a judicial officer after his arrest. In his final assignment of error, petitioner argues that the circuit court erred in failing to dismiss petitioner's robbery conviction, because the taking of the victim's property was "separate in time" from the physical attack of the victim.

In his first, second, and third assignments of error, petitioner argues that the trial court erred in admitting petitioner's statement (given in Illinois), DNA swabs and corresponding test results (obtained with petitioner's consent in Illinois), and the evidence discovered in the dumpster located in West Virginia (described in petitioner's statement given in Illinois). Petitioner contends that the admission of such evidence was improper as the evidence was obtained while petitioner was in Illinois, where PPD officers had no jurisdiction.

This Court employs a two-tiered standard of review to a circuit court's ruling on a motion to suppress.

> [W]e first review a circuit court's findings of fact when ruling on a motion to suppress evidence under the clearly erroneous standard. Second, we review *de novo* questions of law and the circuit court's ultimate conclusion as to the constitutionality of the law enforcement action. Under the clearly erroneous standard, a circuit court's decision ordinarily will be affirmed unless it is unsupported by substantial evidence; based on an erroneous interpretation of applicable law; or, in light of the entire record, this Court is left with a firm and definitive conviction that a mistake has been made. . . . When we review the denial of a motion to suppress, we consider the evidence in the light most favorable to the prosecution.

*State v. Lilly*, 194 W. Va. 595, 600, 461 S.E.2d 101, 106 (1995). Further, this Court has held that

> [w]hen reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. Pt. 1, *State v. Deem*, 243 W. Va. 671, 849 S.E.2d 918 (2020) (citation omitted).

5

Here, based upon our review of the record and under the limited facts and circumstances of this case, we find no error in the denial of petitioner's motions to suppress. With specific regard to petitioner's statement, the circuit court found that petitioner "freely, knowingly, intelligently[,] and voluntarily waived his rights to coun[sel] and made a knowing and intelligent waiver of his right to remain silent and right to counsel." As to the mouth swab provided by petitioner, the circuit court found that such evidence was "properly obtained," in that petitioner was "properly advised" of his rights and he "freely, knowingly, and intelligently waived any right" and "voluntarily consented" to the cheek swab." Viewing those findings in the light most favorable to the State, we cannot say that the circuit court erred in denying petitioner's motion to suppress his statement, the evidence recovered in the dumpster, and the results of the mouth swab he provided to the PPD officers though cooperation with Illinois law enforcement.

In his fourth assignment of error, petitioner argues that the trial court erred by failing to suppress petitioner's statement as PPD officers "took advantage" of an "unreasonable delay" of petitioner's presentment to a judicial officer following his Illinois arrest. This Court has held that "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl. Pt. 3, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978).

Our prompt presentment rule is a creature of statute. West Virginia Code § 62-1-5(a)(1) provides, in pertinent part, that "[a]n officer making an arrest under a warrant . . . shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made." However, this Court has been clear that it is not the delay itself that triggers the application of the rule. Rather, the delay in taking a defendant to a magistrate may become a critical factor in evaluating the voluntariness of a confession "where it appears that the primary purpose of the delay was to obtain a confession from the defendant." Syl. Pt. 6, in part, *State v. Persinger*, 169 W. Va. 121, 286 S.E.2d 261 (1982).

In the instant case, petitioner does not argue that he was coerced into providing a statement to law enforcement officers. Instead, petitioner seemingly argues that the time he spent in custody, four days, was sufficiently substantial to require a finding that law enforcement officers failed to present him to the magistrate "without unnecessary delay" as required by West Virginia Code § 62-1-5(a)(1). This Court has rejected the notion that the length of detainment creates a per se violation. See *State v. DeWeese*, 213 W. Va. 339, 345 n.8, 582 S.E.2d 786, 792 n.8 (2003).

Here, the delay in presentation of petitioner to a judicial officer was explained by personnel from the Clay County (Illinois) Jail, who noted that no judicial officers were immediately available due to their attendance at an out-of-town conference. Upon the judicial officers' return to town, petitioner was promptly presented before said officers. Petitioner does not cite any portion of the record to support his argument that the primary purpose of his delay in presentment was to induce a confession. Here, petitioner was not promptly presented before a magistrate because a magistrate was simply not available. For these reasons, we find no merit in petitioner's argument that the circuit court erred in denying his motion to suppress his statement on the basis of unreasonable delay in presentment.

In his final assignment of error, petitioner argues that the trial court erred in failing to dismiss certain counts of the indictment charging petitioner with first-degree robbery, because elements of robbery involving violence to the person of the victim and the taking of the decedent's property were so separated in time and circumstance as to be separate events.[7] We have previously held that

> [t]his Court's standard of review concerning a motion to dismiss an indictment is, generally, *de novo*. However, in addition to the *de novo* standard, where the circuit court conducts an evidentiary hearing upon the motion, this Court's "clearly erroneous" standard of review is invoked concerning the circuit court's findings of fact.

Syl. Pt. 1, *State v. Grimes*, 226 W. Va. 411, 701 S.E. 2d 449 (2009).

Count four of the indictment returned against petitioner states, in pertinent part, that petitioner

> committed the offense of "Robbery in the First Degree" by unlawfully, intentionally, and feloniously stealing, taking, and carrying away or attempting to steal, take, carry away a mini-van, and/or credit/debit cards and/or checks of some value from the person or presence of [the victim] by committing violence toward [the victim], against the peace and dignity of the State.

During pre-trial proceedings, petitioner moved the circuit court to dismiss the first-degree robbery count of the indictment, as the victim was deceased prior to the taking of her vehicle by petitioner. The circuit court summarily denied said motion "[f]or reasons set out more completely upon the record." This Court reasoned, in *State v. Ruggles*, 183 W. Va. 58, 394 S.E.2d 42 (1990), in upholding Mr. Ruggles' felony murder conviction that "regardless of the fact that the victim might have been dead at the time the robbery occurred, the jury found the defendant guilty . . . obviously finding that the taking was by force."

Under common law, robbery was defined as

> (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods. (Internal citations omitted). Thus, at common law, robbery could be accomplished either by actual physical force or violence

---

[7]In his assignment of error, petitioner argues that the circuit court erred in failing to dismiss the first-degree robbery and felony murder counts in the indictment returned against petitioner. However, in the body of his appellate brief, petitioner only addresses the first-degree robbery count of the indictment. Accordingly, as petitioner has abandoned his argument with respect to the circuit court's alleged failure to dismiss the felony murder count in the indictment, we will not address the same herein. We will limit our consideration to petitioner's claims relating to the circuit court's alleged failure to dismiss the first-degree robbery count of the indictment alone.

inflicted on the victim or by intimidating the victim by placing him in fear of bodily injury.

*State v. Harless*, 168 W.Va. 707, 709, 285 S.E.2d 461, 463-64 (1981) (footnotes omitted). Under the statutory scheme, West Virginia Code § 61-2-12(a) provides, in pertinent part, that "[a]ny person who commits or attempts to commit robbery by: (1) [c]ommitting violence to the person, including striking . . . or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree[.]"

This Court has found that, in West Virginia, "the validity of an indictment is not affected by the character of the evidence introduced before the grand jury, and an indictment valid on its face is not subject to challenge by a motion to quash on the ground the grand jury considered inadequate or incompetent evidence in returning the indictment." *State v. Carter*, 232 W. Va. 97, 101, 750 S.E.2d 650, 654 (2013). Moreover, circuit courts do not routinely peek behind the vehicle of an indictment to assess evidence presented to the grand jury, doing so only where fraud exists. Specifically, this Court had held that "[e]xcept for willful, intentional fraud the law of this State does not permit the court to go behind an indictment to inquire into the evidence considered by the grand jury, either to determine its legality or insufficiency." Syl. Pt. 2, *State ex rel. Pinson v. Maynard*, 181 W. Va. 662, 383 S.E.2d 844 (1989).

Here, based upon our review of the record, the indictment returned against petitioner, including count four, was facially valid and therefore not subject to attack. Moreover, there was no willful or intentional fraud alleged by either party. Thus, we refuse to peek behind the veil of the indictment, and find no merit in this assignment of error.

For the foregoing reasons, we affirm petitioner's convictions and sentences.

Affirmed.

**ISSUED:** October 13, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton